L. A. ANDREW, State Superintendent of Banking, Appellee, v. NORTH ENGLISH SAVINGS BANK, Appellant.

No. 40233.

484

JUNE 23, 1930.

REHEARING DENIED DECEMBER 13, 1930.

*Wallace & Claypool,* for appellant.

*Swift, Swift & Elsenbast,* for appellee.

MORLING, C. J.—The objection to allowing the offset, in substance, is that the two certificates of deposit represent funds held by intervener in trust for his nephew, Hubert Ely, and because of the trust capacity in which the fund is held, may not be offset against intervener's notes, which are his personal obligations.

On January 9, 1919, intervener, B. Harrington, received $8,000 in trust for Hubert Ely. Under date of January 10, 1919, intervener executed to the (now insolvent) bank, North English Savings Bank, his two promissory notes, one for $7,000 and one for $1,000. Under the same date, the bank issued to "B. Harrington, Trustee," two certificates of deposit, one for $7,000 and one for $1,000, both maturing in twelve months. The individual account of intervener in the North English Savings Bank shows, under date of January 10, 1919, deposits of $8,000 and $446.65, and checks drawn aggregating $8,272.87. There is no evidence as to what funds or expenditures these deposits and checks were for, or represented.

The boy Hubert was wayward, and shortly after the notes and certificates of deposit were made, was in trouble in the Salt Lake country. Intervener dispatched his attorney to look after him. The attorney returned with Hubert, and made report. It was then, according to intervener's testimony, decided that, in order to aid in reforming Hubert, it should be represented to him that $3,000 had been spent, and that he had $5,000 left. On February 25, 1919, the $7,000 certificate was taken up, and replaced with one of the same date, for $4,000. Thereafter, under date of

January 9th of each year, two promissory notes were executed by intervener individually to the bank, varying somewhat in amount, depending, according to intervener's testimony, upon the amount to the credit of Hubert in the trust fund, but approximating, in the total, $5,000. Likewise, under the same date each year, the bank issued to "B. Harrington, Trustee," two certificates of deposit, corresponding in amounts and dates of maturity with the promissory notes. The outstanding equivalent notes and certificates were, on the execution of new ones, taken up. The result of these transactions was that, at the time of the closing of the North English Savings Bank, in 1928, the bank held two notes given by B. Harrington, dated January 9, 1928, one for $2,420, due in nine months, and one for $3,000, due in one year, and had issued under the same date its two certificates of deposit, originally payable to "B. Harrington, Trustee," for respectively the same amounts and maturities. These are the promissory notes and certificates which intervener asks to have offset.

The receiver strenuously contends that the $8,000 received by intervener in trust for Hubert Ely went into and is represented by the certificates of deposit aggregating $8,000 issued by the bank to B. Harrington, Trustee, under date of January 10, 1919. It is the claim of intervener that he used that $8,000 in his own business, and that he gave the notes and took the corresponding certificates of deposit as a convenient method of keeping account of the trust fund, and for the purpose of letting Hubert understand that Hubert's money was in the bank.

Neither side has raised any question concerning the absence of necessary parties to this proceeding because of Hubert's not being a party to it, nor is any point raised that the controversy cannot be determined between the parties to the record. The question as presented is one between the bank, on one side, and the intervener, B. Harrington, on the other. Intervener testifies, "I deposited the [Hubert's] money in my own account, and used it in my own business, in connection with the Home Lumber Company." He testifies also that the certificates of deposit and the corresponding promissory notes were merely a paper transaction, and did not represent money in fact deposited by intervener on the one side, or received by him on the other, and that the bank was informed of this situation and purpose. The presi-

dent of the bank testifies to remembering that, in the spring of 1919, "B. Harrington gave me one or two notes, and in return therefor, I issued to B. Harrington, trustee, one or two certificates of deposit, and subsequent to that time, each year, those notes were renewed, and the certificates were renewed at the same time, for a like amount as the note." It is nowhere shown that the credit of $8,000 to the B. Harrington account under date of January 10, 1919, was for these notes. It is not shown that the notes were for any other consideration than the certificates of deposit. Obviously, intervener would not receive the two certificates for $8,000 and a credit in his account for the same $8,000. Intervener was transacting his individual banking business with the North English Savings Bank, and the bank was carrying other notes of his in large amounts; but there is no evidence that would raise any reasonable inference that the notes of January 10, 1919, for $8,000 were, so far as the bank is concerned, for any other purpose or on any other consideration than for the issuance of the certificates of deposit of the same dates, amounts, and maturities. The fact that the renewals and substitutions were during the eight years following for corresponding dates, amounts, and maturities, substantiates intervener's claim. It cannot be found, on this record, that the bank received from intervener the $8,000 trust funds and issued the certificates of deposit of those funds. It must be, on the contrary, found that the certificates of deposit were issued as the equivalent of and representing the amount of intervener's liability to the bank upon his promissory notes.

In so holding, we are not unmindful of the fact that the rate of interest drawn by the notes was always one half of one per cent more than that to be paid on the certificates. Intervener testifies that the president of the bank "thought that the bank possibly stood a little chance for a loss from him; that it was not very good, and suggested that they ought to have one half of one per cent on the thing, which was entirely satisfactory." Originally the notes were for 5½ per cent, and the certificates for 5. The last notes, those now held by the receiver, bear 4½ per cent, and the certificates, 4. It is not unreasonable that the bank should have some compensation for carrying the transaction.

It also appears that intervener paid the interest on the notes

out of his personal account, and credited the interest on the certificates to the trust fund. Whether it was worth one half of one per cent per year to carry the business in this way was for the intervener to determine.

Intervener testifies that, after the notes now held by the receiver were executed, he told Hubert that he was glad to know that Hubert was through his wandering, and hoped he was "going to settle down and do something * * * That I hoped he would, and that I was doing the best I could to keep a little money saved up for him; and I went ahead and told him that this money in the bank did not represent his money at all. I told him that the Salt Lake deal had not cost him $3,000, as I had previously told him it had, nor anywhere near that. * * * you might as well know you have more money, and you will be getting some, as you show you are qualified to take care of it. I visited North English in two or three weeks thereafter * * * I then told Mr. E. D. Baird [president of the bank] that I had told Hubert Ely all about this, and there was really no necessity now of carrying it that way any longer,—might as well discontinue it. We were both in a hurry. He said it would make it perfectly safe to draw a line through that word 'trustee' [in the certificates of deposit]. He got out the notes and certificates attached together, and drew a line through the word 'trustee' in my presence. * * * I knew from hearsay at that time that the North English Bank was in bad condition. * * * I told Mr. Baird that there was no use in leaving those certificates that way; that we had better change them,—either withdraw them entirely or change them. He says, 'We will draw a line through this word "trustee."' ' * * * When I speak of changing it over, I meant to take up the old certificates and make new ones to me in my name only, or else take up both the notes and the certificates. * * *'' Intervener says that he requested Mr. Baird to make a new certificate, "but he told me that he would draw a line through the 'trustee;' that it was a perfectly good offset. * * * That would make it a personal affair. When it comes to figuring up what is due Hubert Ely, I have never taken these certificates into account. However, they have served, in a way, as a ready reference, and in a sense, have served to keep the account separate, inasmuch as I have deducted from the certifi-

cate and the interest the amount he has spent each year, and that has helped keep a record."

Lines were drawn through the word "trustee," following the name B. Harrington, payee in the certificates, leaving them payable to "B. Harrington." The certificates were then held by the bank as collateral security to the notes, and indorsed by intervener as "collateral." The cashier of the bank testifies:

"Q. And then, I understand, these certificates, at the time they were issued, I have designated in the last three or four questions, were, at that time, turned over to the bank, as collateral to the notes that were given by B. Harrington, as representing these certificates and given at the same time as certificates were executed? [These questions referred to the certificates dated January 9, 1919, as well as later ones.] A. Yes, sir, they were collateral to these notes; they were pinned right with these notes. Q. They weren't given as collateral for other notes that were held by the bank that were executed by B. Harrington? A. Not to my knowledge."

Intervener also testifies that, when he indorsed the certificates in 1928, "it was as collateral * * * It always had been held that way, as I understand the meaning of the term * * * Ever since the inception." It appears, however, that the bank had not always retained possession of the certificates. Which ones, if any, other than those now in controversy were retained as collateral to the notes does not appear. Notwithstanding uncertainties and discrepancies, we have on the face of the papers the case of the personal obligation of the intervener to the bank on the promissory notes in question, and reciprocal obligation of the bank (except as to rate of interest) to intervener. The relationship between the bank and intervener, on the face of the certificates, was that of debtor and creditor. *In re Estate of Olson,* 206 Iowa 706; *Leach v. Beazley,* 201 Iowa 337. The certificates of deposit were not given by the bank in return for trust funds received by it. They were given in return for intervener's individual promissory notes. On the face of the transaction, in the light of the circumstances and practical construction placed upon it, there was plainly no intention, either when the first notes and certificates were made out or later, that the bank should actually pay to intervener the amount for which

he was giving his notes. The arrangement at all times, in substance, was that intervener should, in form, give his notes to the bank, and the bank, in form, its certificates of deposit to intervener. It was the expectation and actual purpose that "one hand should wash the other."

It may be that, as between intervener and Hubert, Hubert can hold intervener for the amount represented by these certificates. But Hubert has no rights against the bank, other than what he may have derived through intervener's personal contract with the bank. The bank had never received any funds belonging to Hubert. Intervener's prima-facie liability to the bank on his notes is not because, as between him and the bank, those notes represent trust funds. On this record, Hubert would have no rights against the bank other or higher than the rights of the intervener. If the intervener should be unable to pay the notes, or should be insolvent, the bank ought not to be held to contribute its funds to the trust fund. It ought not to be held to pay the certificates of deposit if the correlative and reciprocal obligation of intervener to pay at the same time his notes, all being items or parts of the same transaction and arrangement, were not performed; and *vice versa.*

While the bank was still a going institution, the word "trustee" was canceled from the certificates of deposit, and arrangement was made by which the notes and certificates should offset each other. The record furnishes no basis for disturbing this arrangement.

As between intervener and the bank, or its successor in interest, the receiver, there is a mutual right to offset the notes against the certificates of deposit.—*Reversed.*

All the justices concur.